IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

COREY IAN WEIDNER,

        Petitioner,

   v.

JERI TAYLOR,

        Respondent.

Case No. 2:13-cv-01973-YY

FINDINGS AND RECOMMENDATION

Tonia Moro
Attorney at Law PC
19 South Orange Street
Medford, Oregon 97501

      Attorney for Petitioner

Ellen F. Rosenblum, Attorney General
Kristen E. Boyd, Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, Oregon 97310

      Attorneys for Respondent

1 – FINDINGS AND RECOMMENDATION

YOU, Magistrate Judge.

Petitioner brings this habeas corpus case pursuant to 28 U.S.C. § 2254 challenging the legality of his state-court convictions for Unlawful Sexual Penetration, Sexual Abuse, Coercion, and Criminal Mistreatment. For the reasons that follow, the Petition for Writ of Habeas Corpus (#2) should be denied.

**<u>BACKGROUND</u>**

In 1998, Amber Weidner met petitioner and became romantically involved with him. Amber was 18 years old at the time, and petitioner was 23. Amber had a two-year-old daughter from a previous relationship (J.C.), and she and petitioner soon had a son together.

Petitioner worked delivering telephone books, film, and medical supplies. Trial Transcript, pp. 212-213. For local deliveries, it was not uncommon for petitioner to take family members along to assist him. J.C. accompanied him on such outings from time to time. *Id* at 87-89.

Petitioner was an alcoholic, abusive father and husband. Authorities arrested him in 2002 for domestic violence when he pulled some of Amber's hair out of her head and threatened to kill her in front of her children. *Id* at 255, 358, 1003-04. Petitioner often threatened his family, was highly concerned about the possibility Amber might be unfaithful to him, and used a belt to punish his wife and the children. *Id* at 741-43, 1022-23.

In 2005, petitioner's mother passed away and left him $150,000 with instructions to pay off his debts and buy a house. *Id* at 964-65.   Petitioner could not afford to buy a house outright in Newberg where the family lived at the time, so he moved them to Willamina.   During this time, he was depressed over his mother's passing and took anti-depressants, but his drinking increased and he became more abusive toward his family.   *Id* at 222-24, 227-28, 439-40.

In the summer of 2006, the family hired Trisha Trask to help with child care because Amber was working full time as an adult caregiver for an older woman named Rita LaChance.   Trask met a man named Arlie Bryant while camping with the Weidners that summer, and began to see him romantically in September of that year.   *Id* at 236, 966.   Petitioner hired both Trask and Bryant to help him with his deliveries.   *Id* at 966.   Trask witnessed petitioner drinking excessively and yelling at everyone including her.   *Id* at 890-92.   She moved out in December 2006 because she "couldn't handle the yelling anymore."   *Id* at 892.   Trask also broke up with Bryant because he was "very mentally abusive" and tried to hit her once.   *Id* at 895.

After Trask left the Weidner's Willamina home, petitioner began to accuse Amber of having an affair with Bryant.   *Id* at 445.   In January 2007, petitioner hit Amber, beat J.C. with a belt, and later found a note from Amber to Bryant that made mention of prior correspondence between the two of them as well. Petitioner threatened to kill Amber in front of the children, and

Amber obtained a restraining order causing petitioner to leave the home.[1]   *Id* at 253, 259-62.

J.C. had been somewhat combative after the family moved to Willamina, but her behavior deteriorated after petitioner left the home.   *Id* at 454-55.   Making matters worse, in March of 2007 Amber lost her job as a caregiver.   *Id* at 282.   She also became romantically involved with Bryant during this time, and she ultimately became pregnant with his child.   *Id* at 409.

Amber planned a birthday party for J.C. in early April and reached out to petitioner to see if he could attend.   Petitioner attended the party and stayed with the family for a couple of nights.   *Id* at 988, 269.   Although he had agreed to stop drinking, yelling, and hitting anyone, he did not stop drinking and Amber kicked him out of the house again.   *Id* at 274. Approximately one week later, Amber and Bryant found a note J.C. had written but apparently never given to anyone that indicated, "I don't want to be here, dad's here.  If you let him move back in I'll run[ ]away."   *Id* at 275, 277.

Bryant moved in with Amber and her children in either late April or early May.   *Id* at 279.   On May 19, Amber found J.C., who was then 11 years old, "trying to kill" her younger sister.   *Id* at 312.   "She had held her down on a bed, and was on top of her choking her."   *Id* at 312.   Amber told J.C. she was in the "biggest trouble of her life for trying to kill her little sister" and threatened to take away "everything she owned out of

---

[1]   Petitioner was later incarcerated at the Yamhill County Jail for violating the restraining order.  Respondent's Exhibit 138, p. 113.

her room." *Id.* J.C. responded, "Oh my God I'm going to kill myself if you take away all my stuff." *Id.* She "started screaming at the top of her lungs" that if Amber took her possessions away, "I'm going to kill myself! I'll do it mom! I'll do it! I'll kill myself, don't take away my stuff! No I'll kill myself! I hate this! I hate my life!" *Id* at 314.

Amber thought her daughter was having a nervous breakdown, and 30 minutes later she wrote a letter to J.C. offering to obtain psychiatric help for her if she was honestly thinking of killing herself. The letter went on to state "Sorry to say, but you've changed. You're not the same [J.C.] you were two years ago. You've changed for the worst." *Id* at 318. Approximately 30 minutes later, Amber went back to talk to J.C., telling her that she was taking her to a hospital if she did not reveal what was wrong. J.C. responded that "daddy has been abusing me . . . has been hurting me." *Id* at 323. She told Amber that "dad's been sneaking [me] out of my room while you're asleep, and rubbing me on his lap." *Id* at 324. An hour later, Amber called the police.

Deputy Twitchell arrived at the Weidner home, and Amber told him that petitioner had abused J.C. almost every night between October 2005 until she kicked him out of the house in January 2007. Respondent's Exhibit 138, Doc. 28-2, p. 113.[2] J.C. disclosed the abuse to him, and indicated that she would have

---

[2] Page numbers for Respondent's Exhibit 138 refer to the electronic filing pagination specific to this federal habeas case.

said something earlier but petitioner "threatened to kill mom, and hurt me really bad if I said anything." *Id.*

J.C. next met with Detective Todd Steele and Becky Brewster, a child welfare worker with the Department of Human Services, at J.C.'s elementary school.  J.C. recounted the physical and sexual abuse she had suffered, and claimed that the abuse began when she was with petitioner in his van on a delivery run.  *Id* at 114. She claimed that petitioner sexually abused her, mainly in the home, "most every night" for about two years.  *Id* at 115.  She claimed the abuse at home always occurred when her mother was sleeping, and petitioner threatened to kill her family if she told about the abuse.  *Id*.

The next day, J.C. went to Juliette's House, a child abuse evaluation center, for a forensic interview and medical exam. Dr. Margaret Miller performed a physical examination of J.C. that did not yield any physical evidence, but she rendered a diagnosis of sexual abuse based upon J.C.'s "clear, concise, consistent, and detailed disclosure." *Id* at 667-68, 671.

While at Juliette's House, J.C. also met with Michelle Warner.  Warner was a mental health counselor with a private practice, but also worked part-time at Juliette's House as a Forensic Interviewer where her job was "to try to get as much, and as complete information as I can from children who are suspect[ed] of having been abused." *Id* at 702-03.  J.C. told Warner that petitioner hit her with a belt on more than twenty occasions, used the belt on her mother, and on one occasion tore out a clump of Amber's hair.  Respondent's Exhibit 138, Doc. 28-

2, p. 116.  She told Warner how petitioner sexually abused her, and the details were consistent with her earlier statements on the subject, including petitioner's threat of death to the family if she ever disclosed the abuse.  *Id* at 116-117.

In the aftermath of J.C.'s interview at Juliette's House, the Yamhill County Grand Jury indicted petitioner on five counts of First Degree Unlawful Sexual Penetration, five counts of First Degree Sexual Abuse, one count of Coercion, and two counts of Criminal Mistreatment.  Respondent's Exhibit 102.

Beginning in about June of 2007, Bryant began assaulting Amber, and Amber characterized the abuse as far worse than the abuse she had endured from petitioner.  Trial Transcript, pp. 393-94.  J.C. reacted badly to the violence in her mother's life, and became, herself, more violent, disrespectful, and prone to outbursts.  *Id* at 480.

In July of 2007 Bryant was arrested for interfering with a 911 call and for Menacing.  Amber contacted the District Attorney's Office in an attempt to have the charges dropped, not because she wanted to be with Bryant, but because Bryant's family stopped providing financial support to her.  Amber believed she might receive assistance from them again if she sought to have the charges dropped.  *Id* at 339-40.

Amber began to write letters to petitioner in jail wherein she indicated that she still had feelings for him, and informed petitioner that J.C. indicated she wanted petitioner to return and for life to return to normal.  *Id* at 355.  J.C. was feeling pressure from her siblings who wanted their petitioner to return

home. *Id* at 415.  J.C. began to ask her mother what would happen to her if she lied, and ultimately told Amber that she had "lied about all of this." *Id* at 481.  J.C. indicated that she did not want to testify at petitioner's trial, and was concerned everyone would hate her and no one would believe her. *Id* at 482.

Petitioner's case proceeded to a jury trial where the State called J.C. and Amber as hostile witnesses.  J.C. testified that she had never seen petitioner drunk, he had never hit her with his hands after his mother passed away but would only give her a "little smack" with his belt "like on my hand" and "on my thighs once." *Id* at 96, 97, 99.  She claimed that petitioner only administered such discipline for "really good reasons" and her father never used his belt on her when she didn't deserve it. *Id* at 100-102.  She claimed that the one time he hit her on her thighs, it gave her only "like a really partial bruise" and that he never hit her with his belt during the time they lived in Willamina. *Id* at 101-02.

J.C. claimed that Amber obtained a restraining order against petitioner only after talking with Rita LaChance, whom J.C. described as a "man hater," who told Amber how much better her life could be without her husband at home. *Id* at 103.  According to J.C.'s testimony, while petitioner was sad after the passing of his mother, he never physically hurt her and she was not in favor of the restraining order and was happy when he returned in April of 2007. *Id* at 104, 109.  She claimed she had no recollection of writing a note that she wanted to run away, or

about telling the police about the note, and was sad when petitioner moved out of the house again. *Id* at 110-12.

J.C. also testified that she lied to Amber about the sexual molestation so she "would get out of a lot of grounding" for choking her younger sister. *Id* at 126. She stated that she lied to the investigating police officers as well as those who interviewed her at Juliette's House. *Id* at 129, 132.

Brewster, the child welfare worker who met with J.C. at her elementary school, testified that J.C. told her petitioner was no longer living with the family because "he had threatened to kill them, and was whipping them with belts, and was . . . 'being rude to them.'" *Id* at 610. J.C. also told her that when petitioner returned briefly to the house, "she clearly did not want him there, that she threatened to run away if her mom didn't make him leave again." *Id* at 613. Brewster detailed the statements J.C. made about the sexual abuse and concluded that based upon J.C.'s statements, as well as the diagnosis from Juliette's House, that there was reasonable cause to believe that petitioner had sexually abused J.C. *Id* at 623.

Dr. Miller testified that despite the lack of any physical evidence, she reached a diagnosis of sexual abuse within a reasonable degree of medical certainty due to the clear, concise, and consistent detailed explanation J.C. gave at Juliette's House. *Id* at 667-68, 670-71. She indicated that she could discern that J.C. was telling the truth about the sexual abuse based upon the level of detail she provided. *Id* at 669.

Warner also testified for the State, and the prosecutor asked her whether she had any concerns that J.C. might be making up the allegations. Warner responded that J.C.'s description of the abuse was so vivid, and included such detail, that she saw no red flags on the issue of veracity. *Id* at 755, 758. She testified that J.C. had no motivation not to tell the truth at Juliette's House. *Id* at 773. At this point, the trial judge interrupted the questioning, asked the jury to step out, and addressed the lawyers:

> This witness is not allowed to comment on the
> credibility of another witness, whether she
> believes or does not believe the victim in
> this case, is a matter for the jury to
> determine, and not for the witness to comment
> on. There's been no objection. This is the
> second time that this has come up, once with
> Dr. Miller, and no[w] with this witness. You
> are not to have her comment on whether she
> believes or does not believe this child in
> this case. Do you wish an instruction to the
> jury or do you wish it left the way it is?

*Id* at 774.

Defense counsel asked that the jury be instructed, and the court admonished Warner, "You're not to discuss whether you believe or do not believe the child in this case." *Id*. The court proceeded to instruct the jury as follows:

> As you know you're to – instructed to
> disregard the last statement by the witness.
> You and you alone are the only ones that
> determine the credibility of any witness in
> this case. So any – any comment about the
> credibility of the witness in this case
> directly (inaudible). You may continue.

*Id* at 775.

Defense counsel called an expert witness, Dr. Christopher Johnson, who believed the interview process at Juliette's House was deficient, the interviewers were too trusting, and that studies showed that a victim's recantation was generally more credible than a prior assertion of abuse.  *Id* at 809-14, 824-26, 832-33, 863-64.   For his part, petitioner took the stand and denied all of the allegations of sexual abuse against him.    *Id* at 993-94.

During the prosecutor's closing argument, she directed the jury's attention to the testimonies of Dr. Miller and Michelle Warner:

> In addition, ladies and gentlemen, Doctor Miller and Michelle Warner didn't get up in front of you and testify about consistent, and concise, and detailed statements for nothing.  I mean this is a medical diagnosis that we're talking about.  It's not based on voodoo magic.  It's a medical diagnosis and they pointed out to you very important things they took into consideration when making that diagnosis.

*Id* at 1130-31.

The jury acquitted petitioner of three of the five counts of Unlawful Sexual Penetration in the First Degree, and found him guilty by non-unanimous votes as to the remaining charges.   As a result, the trial court imposed sentences totaling 585 months in prison.

Petitioner took a direct appeal where he argued, as an unpreserved issue of plain error,[3] that the trial court erred

---

[3]   The plain error doctrine in Oregon allows the Oregon Court of Appeals to consider unpreserved errors of law which are "obvious" and "not reasonably in dispute."  *Ailes v. Portland Meadows, Inc.*, 312 Or. 376, 381, 823 P.2d 956 (1991).

when it instructed the jury need not reach a unanimous decision in order to file petitioner guilty.  Respondent's Exhibit 103. The State moved for summary affirmance on the basis that the law was well-settled on that issue, thus there was no obvious error such as to constitute plain error under Oregon law.  Respondent's Exhibit 104.  Petitioner filed a motion to hold the case in abeyance because the U.S. Supreme Court was considering a petition for writ of certiorari in *State v. Bowen*, 215 Or. App. 199, 168 P.3d 1208 (2007), *modified on recons,* 220 Or. App. 380 (2008), an Oregon case challenging the legality of non-unanimous jury verdicts in criminal cases.[4]  The Oregon Court of Appeals declined to hold the case in abeyance and granted the State's Motion for Summary Affirmance.  Respondent's Exhibit 105.

Petitioner sought reconsideration on the issues of abeyance and summary affirmance.  Respondent's Exhibit 106.  While petitioner's request for reconsideration was pending, the Oregon Supreme Court issued its decision in *State v. Southard*, 347 Or. 127 (2009), precluding the introduction of an expert diagnosis of abuse in the absence of any physical evidence.  Appellate counsel did not file a second petition for reconsideration based upon *Southard*, and thirteen days later, the Oregon Court of Appeals denied petitioner's pending request for reconsideration. Respondent's Exhibit 107.  Petitioner then unsuccessfully petitioned the Oregon Supreme Court for review.  Respondent's Exhibit 109.

---

[4]   The Supreme Court denied certiorari in the case and never resolved the issue.  558 U.S. 815 (2009).

Petitioner next filed for post-conviction relief ("PCR") in Umatilla County raising claims of ineffective assistance of trial and appellate counsel, as well as claims of prosecutorial misconduct. Respondent's Exhibit 112. Among his claims, petitioner alleged that his trial attorney failed to: (1) object to the sexual abuse diagnosis as well as the vouching testimony of Miller and Warner; and (2) object and move for a mistrial in response to improper comments from the prosecutor during closing argument. Petitioner also argued that appellate counsel was ineffective when she failed to present the *Southard* issue as plain error before his conviction became final. *Id.* The PCR court denied relief on these claims. Respondent's Exhibit 143. The Oregon Court of Appeals affirmed that decision without opinion, and the Oregon Supreme Court denied review. Respondent's Exhibits 148 & 149.

Petitioner filed this 28 U.S.C. § 2254 habeas corpus case on November 6, 2013. With the assistance of appointed counsel, he filed an Amended Petition for Writ of Habeas Corpus on February 26, 2014 raising 15 grounds for relief. Respondent asks the court to deny relief on the Amended Petition because: (1) petitioner failed to fairly present Grounds Four, Five, Six, Eight, Nine, Ten, and Fourteen to the Oregon state courts, leaving them procedurally defaulted; (2) the state courts denied petitioner's remaining claims in decisions that were neither contrary to, nor unreasonable applications of, U.S. Supreme Court precedent; and (3) all claims lack merit.

///

13 – FINDINGS AND RECOMMENDATION

## DISCUSSION

### I. Standard of Review

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's findings of fact are presumed correct, and petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant relief "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id* at 413. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. *Id* at 410. Twenty-eight U.S.C.

§ 2254(d) "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.   It goes no farther."  *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011).

## II. <u>Unargued Claims</u>

With the assistance of appointed counsel, petitioner argues that he was denied effective assistance of counsel based upon: (1) his trial and appellate attorneys' failure to challenge the admission of the child abuse diagnosis and vouching testimony and comments; and (2) his trial attorney's failure to object or move for a mistrial in response to the prosecutor's improper and prejudicial remarks during closing argument.   These claims correspond to Grounds One, Two, Three, Seven, Eleven, and Fifteen.

Petitioner does not argue the merits of his remaining claims, nor does he address any of respondent's arguments as to why relief on these claims should be denied.   As such, petitioner has not carried his burden of proof with respect to these unargued claims.  *See Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (petitioner bears the burden of proving his claims). Even if petitioner had briefed the merits of these claims, the court has examined them based upon the existing record and determined that they do not entitle him to relief.

## III. <u>Vouching Testimony and Sexual Abuse Diagnosis</u>

Petitioner alleges that his trial and appellate attorneys were ineffective when they failed to challenge the testimony from

Miller and Warner vouching for J.C.'s truthfulness regarding her initial disclosure of sexual abuse. He asserts that he was prejudiced by this failure where his case turned on the credibility of the witnesses, and his case ended in a non-unanimous verdict of guilty.

Because no Supreme Court precedent is directly on point that corresponds to the facts of this case, the court uses the general two-part test established by the Supreme Court to determine whether petitioner received ineffective assistance of counsel. *Knowles v. Mirzayance*, 556 U.S. 111, 122-23 (2009). First, petitioner must show that his counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). Due to the difficulties in evaluating counsel's performance, courts must indulge a strong presumption that the conduct falls within the "wide range of reasonable professional assistance." *Id* at 689.

Second, petitioner must show that his counsel's performance prejudiced the defense. The appropriate test for prejudice is whether the petitioner can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id* at 694. A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial. *Id* at 696. When *Strickland's* general standard is combined with the standard of review governing 28 U.S.C. § 2254 habeas corpus cases, the result is a "doubly deferential judicial review." *Mirzayance*, 556 U.S. at 122.

During petitioner's PCR trial, the State introduced an affidavit from his trial attorney wherein she explained her strategy as to the witness comments on credibility:

> 11. I did not object to the testimony of Dr. Miller and Michelle Warner as vouching or a comment on the credibility of [J.C.]. I did not see them actually coming out and saying that they thought she was telling the truth. Rather, the specifics they discussed seemed to me more like elements they looked at to arrive at a diagnosis.

> 12. Dr. Miller and Michelle Warner might have been pushing the edges of what was appropriate, but in my experience, courts had routinely allowed that kind of testimony. This was before *Southard* and the cases that came after *Southard,* which definitely reined in what sexual abuse evaluators could say in their testimony.

> 13. I had my own expert to testify about the sexual abuse accusations. It was helpful to have before the jury those elements that Dr. Miller and Michelle Warner felt to be important before the jury. That way, my own expert could talk about the flaws in relying on those elements and demonstrate how the diagnosis of the state's experts was subjective and biased. That was part of the defense in this case, that the state came to a conclusion and was unwilling to remain objective and open-minded as evidence developed.

> 14. I wanted my own sexual abuse allegation expert, Dr. Christopher Johnson, to discuss inconsistency, alternative motives, alternative explanations for behaviors, etc. Therefore, I was going to talk about these issues even if the state and their experts did not. Given that it was my intention to discuss the elements that go into evaluating a sexual abuse allegation, it would have been inappropriate for me to object when the district attorney and her experts were doing

the same thing. Moreover, after my expert
testified on these issues, the state could
then have brought their experts to discuss on
rebuttal exactly those issues that were
handled on direct instead, at a time farther
removed from deliberation by the jury.

15. I wanted to analyze the circumstances
and details of the disclosures, evaluation,
and recantation with my own expert.
Therefore, I wanted everything out there,
good and bad, as fair game where credibility
of the victim was concerned.

Respondent's Exhibit 132, pp. 3-5.

The PCR court denied relief on this claim as follows:

4. Attorney knew that the diagnosis of sex
abuse was coming in based on the law at that
time. She wanted to discredit it with her
own expert, therefore it was reasonable
strategy to allow evidence that diagnosis
based only on what the child said. Her
expert was ready to contradict that basis.
Court intervened and instructed jury to
disregard and said credibility would be up to
the jury alone.

Respondent's Exhibit 143, p. 2.

Petitioner contends that where credibility was the central
issue in his case, trial counsel was obligated to object to any
impermissible vouching. He further asserts that that a trial
attorney could not possibly make a reasonable tactical decision
not to do so.

It is difficult to determine exactly what expert comments on
J.C.'s credibility were permissible under Oregon law prior to
*Southard*. However, this court need not resolve that issue of
state law. Instead, the question is whether the PCR court's
decision (affirmed by the Oregon Court of Appeals) resting on the
reasonableness of defense counsel's trial tactic and the trial

court's curative instruction was not only wrong, but so unreasonable that no fairminded jurist could possibly agree.

It is inescapable that prior to *Southard,* Oregon permitted, at least to a certain degree, comments on witness credibility in the form of a diagnosis of sexual abuse based upon nothing more than the victim's statements. Given this reality and facing the admission of such a diagnosis, counsel reasonably believed that her best opportunity to mount a vigorous defense was to use her own expert to attack the underlying basis for Miller and Warner's diagnoses of sexual abuse: the veracity of J.C.'s pretrial statements and the circumstances surrounding the determination of veracity. Where defense counsel's Affidavit shows a well-reasoned pre-*Southard* strategy, trial counsel's performance did not fall below an objective standard of reasonableness.

Moreover, it is significant that the trial judge interrupted the proceedings to limit any improper comments on the credibility of other witnesses, instructed the jury to disregard such a statement, and instructed them that credibility determinations are solely within the province of the jury. Trial Transcript, p. 775. The trial judge essentially made counsel's objection for her. The trial judge reinforced this instruction when defense counsel later elicited repeated testimony from Amber that she believed J.C.'s recantation. *Id* at 929-33. Presumably, the jury followed these repeated instructions. *See Richardson v. Marsh*, 482 U.S. 200, 206 (1987) (it is an "almost invariable assumption of law that jurors follow their instructions."). As such, even if counsel should have objected, petitioner cannot show a

reasonable likelihood that the result of the trial would have been different.

Where trial counsel's strategy was a reasonable one, and where petitioner cannot establish prejudice, this court cannot conclude that the PCR court's decision was so fundamentally flawed that no fairminded jurist could agree with it. Accordingly, the PCR court's decision did not amount to an unreasonable application of clearly established federal law.

Similarly, given the reasonableness of counsel's tactics and the lack of prejudice to her client, appellate counsel was under no duty to raise the unpreserved vouching claims as plain error as petitioner alleges. The court also notes that even if appellate counsel had been so obligated, petitioner cannot establish prejudice due to the difficulty counsel would have encountered attempting to characterize trial counsel's strategic decision an obvious error, apparent on the face of the record, that was not reasonably in dispute. *See Ailes v. Portland Meadows, Inc.*, 312 Or. 376, 381, 823 P.2d 956 (1991); *see also Smith v. Robbins*, 528 U.S. 259, 285-286 (2000) (In proving prejudice with respect to the performance of appellate counsel, a petitioner must demonstrate a reasonable probability that but for appellate counsel's failure, "he would have prevailed on his appeal."). Consequently, the PCR court's decision on the appellate counsel claim also did not involve an unreasonable application of clearly established federal law.

///

///

VI.  **Failure to Object During Closing Argument**

The State opened its closing argument in petitioner's case by asserting that petitioner almost destroyed J.C. mentally, emotionally, and psychologically, and "obliterate[ed J.C.'s] spirit to the point where she literally wanted to come out of her own skin . . . by digging thumb tacks into her wrist, into her forearm because she couldn't deal with the pain. . . ."  Trial Transcript, p. 1099.  For her part, petitioner's attorney stated during closing argument that the State's witnesses were unwilling to be open minded to anything J.C. said after she made her initial disclosure of sexual abuse.  *Id* at 1150.  This prompted the prosecutor in rebuttal to "take exception at the notion that's been trying to be given that the State's job is anything but to do justice" and to "defend the Juliette's House people, because clearly they did take into consideration the fact that this child recanted."  *Id* at 1162-63.

Petitioner argues that the prosecutor's closing argument was improper insofar as she engaged in vouching and intended to inflame the prejudices of the jury when she stated that petitioner had "obliterated" J.C.'s spirit and destroyed her. He believes that the prosecutor asked the jury to convict him based upon the pursuit of justice, not the sufficiency of the evidence, and trial counsel should have objected, requested a mistrial, and/or sought cautionary instructions.

The prosecutor explained her closing argument for the PCR court:

///

21. I did not intend to make any inflammatory or unduly prejudicial statements during my closing argument. I did want to get the attention of the jury and show that the domestic violence, the emotional abuse, the verbal abuse, the threats, and all those things other than the sexual abuse, had destroyed [J.C.]. It shows why [J.C.] would have supported her mother in reuniting with petitioner, thereby requiring her recantation. She had essentially been broken down by petitioner's malfeasance, her mother's desire to get back together with petitioner, and the pressure from her family to remove any obstacles from the recreation of the family unit that had existed before she disclosed the abuse. I felt that was proper argument before the jury.

22. I certainly did want to persuade the jury that the evidence demonstrated that petitioner was guilty. So that is the argument I made. I did not think that was improper or vouching.

23. Petitioner alleges that I was essentially vouching for myself and my motivations, as well as the clinical workers at Juliette's House, during my rebuttal argument. The reason that I made the rebuttal statements he takes issue with is that the defense argument directly attacked my motivations, the manner in which I and the others assessed the disclosures and recantations, and our objectivity in prosecuting the case. If that attack had not been made, I would not have made those statements. However, it would have been unfair for the defense to be allowed to attack me and Juliette's House staff, not the evidence, but us as people, without being allowed to address that in rebuttal. The door was opened by the defense.

Respondent's Exhibit 133, pp. 5-6.

Defense counsel's explanation of her decision not to object to the prosecutor's closing argument is as follows:

30.  I did not object to portions of the state's closing argument.  During part of that argument the district attorney discussed how petitioner's actions had damaged the victim.  I felt that was an area they are allowed to discuss.  Certainly it was prejudicial, but it was not unduly prejudicial.  Lots of things are said, by both sides, during closing arguments.  Most of the time, if I feel it necessary to refute something the state says that is too close to the line, I deal with it in my own closing.

31.  Sometimes over the top statements by the district attorney actually provide me with more ammunition, as well as causing the jury to see the district attorney as being too shrill and invested in their case.

32.  The district attorney also referenced in her rebuttal her own approach to how she assesses a case, and how the members of Juliette's House assess a case.  That was a response to arguments made during my own closing arguments.  Given that I had assaulted the state's objectivity and manner in which they assessed the case, I felt I had opened the door to the state's rebuttal to my claims.  Therefore, I did not feel that I could object.

Respondent's Exhibit 132, p. 6.

The PCR court determined that there was insufficient evidence of attorney inadequacy or prejudice, and specifically found that the "DA closing [was] not outside [of the] wide latitude allowed.  It was not vouching."  Respondent's Exhibit 143, p. 3.

The trial transcript in this case reveals that it was petitioner's attorney who first cast the State in a dubious light when she claimed during closing argument that the State never questioned J.C.'s initial disclosure, but vigorously did so with

respect to her recantation.   Trial Transcript, p. 1150.   She asserted that the State did not want to hear any evidence that contradicted its case, and whether it was a victim of domestic violence or a child victim, such evidence was "not . . . welcomed."   *Id* at 1137.   She told the jury that "the State has put a lot of resources into – they have completely bought into the story that the child has made, and they really don't want to hear anything else."   *Id.*

Based on this record, defense counsel was correct that she opened the door to the prosecutor's argument that she was motivated by justice, not an improper purpose.   The prosecutor did not improperly vouch for the credibility of any witness, and argued that the evidence showed petitioner committed the charged crimes, thereby having a profoundly negative affect on the young victim.   As the prosecutor's closing falls within the realm of permissible advocacy, counsel was under no duty to object, thus the PCR court's decision did not unreasonably apply clearly established federal law.

### III. **Failure to Raise *Southard* on Appeal**

Finally, petitioner alleges that appellate counsel was ineffective when he failed to raise a *Southard* claim to the Oregon Court of Appeals*.*   He claims that even though the Oregon Supreme Court decided *Southard* after the Oregon Court of Appeals summarily affirmed the PCR court's decision and he had already filed a motion for reconsideration, there was still a viable avenue by which to present a new *Southard* claim to the Oregon Court of Appeals for consideration on its merits.

Appellate counsel submitted an Affidavit during petitioner's PCR proceedings in which she acknowledged extensive knowledge of the *Southard* issue leading up to that decision insofar as she had "numerous discussions with the author of the [*Southard*] briefs and [had] participated as a practice judge in the moot court exercise to help that attorney prepare for the oral argument in the Supreme Court." Respondent's Exhibit 135, pp. 1-2. At the time she filed her Appellant's Brief in petitioner's case, she did not include such an issue for plain error review because, pre-*Southard,* the admission of a diagnosis of sexual abuse was obviously not plain error. *Id* at 2. She acknowledged that once the *Southard* decision was issued on October 1, 2009, "attorneys in this office began filing briefs raising admission of medical diagnoses of 'child sexual abuse' as plain error on the face of the record, no physical evidence of abuse was presented, without regard to whether the trial attorney had made any objection. . . ." *Id* at 5. She opted not to file a second petition for reconsideration presenting the *Southard* issue "because of the long-standing rule that petitions for reconsideration could not present assignments of error raising new issues that had not been presented in the opening Appellant's Brief. . . ." *Id*.

The PCR court resolved the issue in the State's favor when it found "[i]nsufficient evidence that the appellate attorney could have found a way to get this conviction reversed based on *Southard*. The timing was just wrong and no proof that her representation fell below the constitutional standard. Her

representation did not prejudice the petitioner." Respondent's
Exhibit 143, p. 3 (italics added).

The Oregon Rules of Appellate Procedure did allow for the
filing of a petition for reconsideration based upon a change in
the case law after the Oregon Court of Appeals had rendered its
decision. ORAP 6.25(d). Importantly, however, such a petition
for reconsideration was required to be filed within 14 days of
the Oregon Court of Appeals' decision. ORAP 6.25(2). The Oregon
Court of Appeals issued its decision in petitioner's case on
August 19, 2009. Appellate counsel timely filed her petition for
reconsideration five days later on August 24, 2009. By the time
the Oregon Supreme Court decided *Southard* on October 1, 2009,
petitioner was well outside the 14-day window in which to move
for further reconsideration. Consequently, appellate counsel
had no authority to file a second such petition.

Although petitioner argues that pursuant to ORAP 1.20(5),
"the [appellate] court on its own motion or on motion of any
party may waive any rule[,]" his contention that the Oregon Court
of Appeals likely would have waived the 14-day limitation period
on petitions for reconsideration to consider his unpreserved
*Southard* claim as plain error is highly speculative. In any
event, when the PCR court determined that "the timing was just
wrong" in the context of the specific procedural posture of
petitioner's case, it necessarily concluded that Oregon's
procedural rules precluded appellate counsel from taking the
route petitioner now claims his appellate attorney should have
pursued. The Oregon Court of Appeals had the opportunity to

address this issue of state appellate procedure and affirmed the PCR court's decision. A federal habeas corpus court is strictly prohibited from revisiting such a determination on an issue of state law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[W]e reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Bains v. Cambra*, 204 F.3d 964, 972 (9th Cir.) ("a federal court is bound by the state court's interpretations of state law."), *cert. denied*, 531 U.S. 1037 (2000), citing *Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *see also Mendez v. Small*, 298 F.3d 1154, 1158 (9th Cir. 2002) ("A state court has the last word on the interpretation of state law."), citing *McSherry v. Block*, 880 F.2d 1049, 1052 (9th Cir. 1989), *cert. denied*, 499 U.S. 943 (1991); *Peltier v. Wright*, 15 F.3d 860, 862 (9th Cir. 1994) ("state courts are the ultimate expositors of state law.").

Petitioner also contends that counsel's failure to introduce his *Southard* claim on direct appeal was not only a failing in terms of understanding Oregon's procedural law, but also constituted a failing based upon federal law which provides that new decisions fully apply to post-trial defendants whose cases are on direct review. It is true that "[f]ailure to apply a newly declared constitutional rule to criminal cases pending on direct review violates the basic norms of constitutional adjudication." *Griffith v. Kentucky*, 479 U.S. 314, 322 (1987); *see also Brecht v. Abrahamson*, 507 U.S. 619, 634 (1993) (noting that new decisions always have retroactive application on direct

review).   However, where the Oregon Court of Appeals had already rejected petitioner's case prior to the *Southard* decision, and where his time to petition for reconsideration had passed, counsel was simply not in the proper procedural position to raise the *Southard* claim to the Oregon Court of Appeals.

Due to the timing of the Oregon Court of Appeals' decision in petitioner's case and the Oregon Supreme Court's decision in *Southard,* appellate counsel's performance did not fall below an objective standard of reasonableness when she did not file a second, untimely petition for reconsideration in an attempt to raise an unpreserved claim for the first time on appellate review.   Moreover, where petitioner's *Southard* claim was procedurally precluded as a matter of state, law, he cannot establish that, had appellate counsel filed the second petition for reconsideration, there is a reasonable probability that the outcome of his appeal would have been different.   For all of these reasons, the PCR court's decision denying relief on this claim is neither contrary to, nor an unreasonable application of, clearly established federal law.

## RECOMMENDATION

For the reasons identified above, the Petition for Writ of Habeas Corpus (#2) should be denied and a judgment should be entered dismissing this case with prejudice.   The court should, however, issue a Certificate of Appealability as to all of petitioner's argued claims on the basis that he has made a substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253(c)(2).

## SCHEDULING ORDER

This Findings and Recommendation will be referred to a district judge. Objections, if any, are due within 17 days. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 30th day of August, 2016.

_____
/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge

29 – FINDINGS AND RECOMMENDATION